**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| RONALD D. NIELSEN, ) | |
| ) | |
|     Plaintiff, ) | NO.:   13-cv-01717 RSM |
| ) | |
| v. ) | **AMENDED COMPLAINT FOR** |
| ) | **BREACH OF CONTRACT,** |
| UNUM LIFE INSURANCE COMPANY OF ) | **WRONGFUL DISCRIMINATION,** |
| AMERICA, UNUM GROUP CORPORATION, ) | **BREACH OF FIDUCIARY DUTY,** |
| CATHOLIC HEALTH INITIATIVES, ) | **INSURANCE BAD FAITH, CPA** |
| CATHOLIC HEALTH INITIATIVES PLAN, ) | **VIOLATIONS, IFCA VIOLATIONS,** |
| AND FRANCISCAN HEALTH SYSTEM, ) | **DECLARATORY JUDGMENT, AND** |
| ) | **CLAIMS UNDER ERISA** |
| ) | |
|     Defendants. ) | |

Ronald D. Nielsen, through his counsel, T. Jeffrey Keane and the Keane Law Offices, for Amended Complaint against defendants alleges as follows:

## PARTIES

1.    Plaintiff Ronald D. Nielsen, M.D. is and was at all relevant times a resident of Tacoma, Washington.  From May 4, 2005 until May 21, 2010, Dr. Nielsen was employed as a Hospice and Palliative Medicine Physician by defendant Franciscan Health System ("FHS").

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

2.     Defendant FHS is a nonprofit corporation incorporated under the laws of Washington, with its principal place of business in Tacoma, Washington.  Dr. Nielsen worked at Franciscan Hospital, a community hospital operated by FHS in Federal Way.  FHS is affiliated with defendant Catholic Health Initiatives.

3.     Defendant Catholic Health Initiatives ("CHI") is a nonprofit corporation incorporated under the laws of Colorado, with its principal place of business believed to be in Englewood, Colorado.  CHI provided a Long-Term Disability (LTD) benefits plan to its employees and to employees of its affiliated organizations, including FHS.  FHS operates hospitals and medical clinics in King County and Pierce County, Washington.  CHI is and was at all times material to this complaint the Plan Administrator for this LTD Plan.  The LTD Plan was funded through an insurance policy ("the policy" or "the LTD policy") issued by Defendant Unum Life Insurance Company of America ("Unum Life").  Dr. Nielsen was a participant in this LTD plan and a beneficiary of the policy.  CHI also sponsored a Short-Term Disability (STD) program known as the Catholic Health Initiatives Salary Continuation Program ("STD Program").  Through this STD Program, CHI provided STD benefits to its employees and to employees of its affiliated organizations, including FHS.  CHI was the Program Administrator for its STD Program.  Dr. Nielsen was a participant in the STD program. CHI had the responsibility for paying benefits to which participants were entitled under the STD program.

4.     Defendant Catholic Health Initiatives Plan ("the LTD Plan") is an employee welfare benefit plan established to provide LTD benefits to employees of CHI and affiliated organizations such as FHS.  Dr. Nielsen was a participant in the LTD Plan.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

5.    Defendant Unum Life Insurance Company of America ("Unum Life") is incorporated in the State of Maine and has its principal place of business in Portland, Maine. Unum Life is a wholly-owned subsidiary of Unum Group Corporation. The LTD Plan was funded by insurance issued by Unum Life under policy number 120265-114. As the insurer of the LTD Plan, Unum Life was and is obligated to pay benefits to which participants are entitled under the LTD Plan.

6.    CHI and the LTD Plan delegated to Unum Life and Unum Group (described below) the authority and responsibility for making benefit determinations under the LTD Plan. Unum Life and Unum Group made benefits determinations under the LTD Plan. In other words, Unum Life and Unum Group decided whether any given claim would be paid, the amount of the payments, and the duration of the payments. Unum Life and Unum Group continue to perform this function. Unum Life and Unum Group made the benefit decisions denying Dr. Nielsen's claim for LTD benefits. The STD Program identified "Unum" as the Claims Administrator for that program. Both the initial denial of Dr. Nielsen's STD claim and the denial of his appeal concerning the STD claim were described in letters bearing the "Unum" letterhead and the explanation that "Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries." Thus, Unum Life, as one of Unum's Group's insuring subsidiaries, made or participated in these decisions.

7.    Defendant Unum Group Corporation ("Unum Group") is incorporated in the State of Delaware and has its principal place of business in Chattanooga, Tennessee. Unum Group is the largest disability insurer in the world. As noted above, CHI and the LTD Plan delegated to Unum Group (along with Unum Life) the authority and responsibility for making benefit determinations under the LTD Plan. Along with Unum Life, Unum Group in fact

1    made those determinations, including the decisions to deny Dr. Nielsen's claim for LTD

2    benefits.  The STD Program identified "Unum" as the Claims Administrator for that program.

3    Both the initial denial of Dr. Nielsen's STD claim and the denial of his appeal concerning the

4    STD claim were described in letters bearing the "Unum" letterhead and the explanation that

5    "Unum is a registered trademark and marketing brand of Unum Group and its insuring

6    subsidiaries."  Thus, Unum Group made or participated in these decisions.

                            **JURISDICTION AND VENUE**

7        8.      Unum Life is authorized by the Washington Insurance Commissioner to sell,

8    and does sell, insurance in Washington.    Unum Life transacts a substantial amount of

9    business within the State of Washington and has had continuous and systematic general

10   business contacts with Washington for many years.  Unum Life has appointed large numbers

11   of agents and agencies in the State of Washington to sell insurance on its behalf.  Pursuant to

12   RCW 48.05.200, Unum Life has appointed the Washington Insurance Commissioner as its

13   agent for service of process in causes of action arising within Washington.  In addition, Unum

14   Life issued the LTD policy that funded the LTD Plan.  That policy, in turn, covered hundreds

15   of employees of FHS who lived and worked in the State of Washington, including King

16   County.  In addition, Unum Life made the decisions, described more fully below, to deny Dr.

17   Nielsen's claim for LTD benefits and to deny his appeal.   This Court has jurisdiction over the

18   person of Unum Life.  Unum Life transacts a substantial part of its usual and ordinary

19   business in King County, Washington and did so at all times material to this action.  Unum

20   Life also has offices in King County for transaction of business.  Venue is proper in this

21   Court.

22

23

24

25

AMENDED COMPLAINT - 4

9.      Through its wholly owned subsidiary Unum Life, Unum Group transacts a substantial amount of business within the State of Washington, has had continuous and systematic general business contacts with Washington for many years, and has appointed large numbers of agents and agencies in the State of Washington to sell insurance on its behalf.  In addition, Unum Group made the decisions, described more fully below, to deny Dr. Nielsen's claim for LTD benefits and to deny his appeal.  Both of these decisions concerning the LTD claim were described in letters bearing the "Unum" letterhead and the explanation that "Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries."  Unum Group also made, and continues to make, decisions about eligibility for benefits under the LTD plan affecting hundreds of employees of FHS living and working in the State of Washington, including King County.   In addition, Unum Group was the Claim Administrator for the STD Program. Unum Group also made the decisions, described more fully below, to deny Dr. Nielsen's claim for STD benefits and to deny his appeal for those benefits.   Both of these decisions concerning the STD claim were described in letters bearing the "Unum" letterhead and the explanation that "Unum is a registered trademark and marketing brand of Unum Group and its insuring subsidiaries." Unum Group transacts a substantial part of its usual and ordinary business in King County, Washington and did so at all times material to this action.  Unum Group also has offices in King County for transaction of business.  This Court has jurisdiction over the person of Unum Group.

10.      The LTD Plan covered and continues to cover hundreds of employees of FHS living and working in the State of Washington, including King County.   The LTD Plan transacts a substantial amount of business within the State of Washington and has had

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

continuous and systematic general business contacts with Washington for many years. This Court has jurisdiction over the person of the LTD Plan.

11.    CHI contracted with Unum Life for Unum to provide insurance for hundreds of employees of FHS living and working in the State of Washington, including King County. CHI was the Plan Administrator for the LTD Plan at the time that Dr. Nielsen's claim for LTD benefits was denied.  CHI continues to be the Plan Administrator for the LTD Plan.  As the Administrator of the LTD Plan, CHI takes actions that affect hundreds of employees of FHS living and working in the State of Washington, including King County.  Through its affiliate FHS, CHI operates multiple medical facilities in the State of Washington.  CHI transacts a substantial amount of business within the State of Washington and has had continuous and systematic general business contacts with Washington for many years. CHI was also the Program Administrator for the CHI Salary Continuation Program (STD benefits). As the Program Administrator of the CHI Salary Continuation Program (STD benefits), CHI took actions that affected hundreds of employees of FHS living and working in the State of Washington. This Court has jurisdiction over the person of CHI.

12.    Defendant FHS is Washington nonprofit corporation and has its principal place of business in Washington.  FHS operates multiple medical facilities in King County, Washington and transacts a substantial part of its usual and ordinary business in King County, and did so at all times material to this action.  This Court has jurisdiction over the person of FHS.  Venue is proper in this Court.

13.    Dr. Nielsen originally filed this action in the Superior Court of Washington for King County.   Unum Life and Unum Group removed the action to this Court on federal

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

question grounds, contending that the Employee Retirement Income Security Act ("ERISA"), 29 USC § 1001 et seq., governs this case.

## **ERISA DOES NOT APPLY**

14.     CHI is, and was at all times material to this complaint, a religious organization associated with the Catholic Church.

15.     The organization that is now FHS was founded by the Sisters of St. Francis of Philadelphia, a religious organization associated with the Catholic Church.  FHS is, and was at all times material to this complaint, a religious organization associated with the Catholic Church.

16.     The LTD Plan and the STD Program are both "church plans" within the meaning of 29 USC § 1002(33).  ERISA generally does not apply to church plans.   29 USC § 1003(b)(2).   Unum Life and Unum Group (collectively designated as "Unum" hereinafter unless otherwise indicated) have admitted in correspondence to Dr. Nielsen's counsel that Dr. Nielsen's claims are not governed by ERISA.   Because CHI and the LTD Plan delegated authority to Unum to make benefits determinations under the LTD Plan, and because Unum was acting within the course of that authority in determining Dr. Nielsen's benefits and in determining that ERISA does not apply to his claim, Unum was the agent of CHI and the LTD Plan in doing so.   CHI and the LTD Plan are therefore bound by Unum's admission under the rule that an agent acting within the scope of its agency may bind the principal. Because CHI delegated authority to Unum to make benefits determinations under the Salary Continuation Program (STD), and because Unum was acting within the course of that authority in determining Dr. Nielsen's benefits and in determining that ERISA does not apply to his STD claim, Unum was the agent of CHI in doing so. CHI is therefore bound by Unum's admission under the rule that an agent acting within the scope of its agency may bind the principal.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

17.     CHI did not properly elect to have either the LTD Plan or the STD Program treated as being subject to ERISA.

## THE TERMINATION OF DR. NIELSEN'S EMPLOYMENT BY FHS, HIS INABILITY TO WORK SINCE THAT TIME, AND HIS HISTORY OF DIFFICULTIES IN THE WORKPLACE DUE TO HIS ILLNESSES

18.     From May 4, 2005 until May 21, 2010, Plaintiff was employed as a Hospice and Palliative Medicine Physician by FHS.  Dr. Nielsen worked at St. Francis Hospital, a community hospital operated by FHS in Federal Way. On May 21, 2010, FHS fired Dr. Nielsen from his job.   He was fired for difficulties with attention, concentration, and working memory, and for inability to follow through in a timely manner.  He was 55 years old at the time he was fired.

19.     With extremely limited exceptions of very short duration, Dr. Nielsen has been continuously unable to find any gainful employment as a physician since the termination of his employment by FHS on May 21, 2010.

20.     Before he began working for FHS in 2005, Dr. Nielsen had had difficulty meeting the performance standards in other jobs where he worked as a physician.   For example, after working for a small private medical practice in Brewster, Washington for about three years, Dr. Nielsen was asked to leave.  His wife, who is also a physician, worked in the same practice but was asked to stay.  It was only due to her assistance that he was able to maintain his employment there for as long as he did.  When Dr. Nielsen left that practice in Brewster after being asked to leave, his wife voluntarily left also.  The two of them opened their own practice in Brewster, which they operated from 1996 to 2000.  During this time, Dr. Nielsen's wife helped him considerably with organizational and administrative matters and helped to provide a highly structured environment for his work.  In the period between 2000 and 2005, Dr. Nielsen worked in three different jobs, holding each one for only a relatively

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

short time. His employment in at least one of these three jobs was involuntarily terminated. Dr. Nielsen's difficulty in holding a job during the years before 2005 was due to the same problems with attention, focus, concentration, organization, working memory, anxiety, slow processing, sequencing, understanding priorities, and inability to pick up on social cues that caused him to lose his job at FHS.

## UNUM'S DENIAL OF DR. NIELSEN'S CLAIM FOR STD BENEFITS

21.     Dr. Nielsen was covered by the STD Program. In June 2010 Dr. Nielsen submitted a claim for STD benefits to Unum.

22.     The STD program defined "disabled" as follows:

You are disabled when Unum determines that:
- you are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and
- you have a 20% or more loss in **weekly earnings** due to that same sickness or injury.

23.     The STD program defined "**LIMITED**" as "what you cannot or are unable to do."

24.     The STD program defined "**MATERIAL AND SUBSTANTIAL DUTIES**" in pertinent part as

duties that:
- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified.

25.     The STD program defined "**REGULAR OCCUPATION**" as

the occupation you are routinely performing when your disability begins.
Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

At the time Dr. Nielsen's disability began, his "regular occupation" was Hospice and Palliative Medicine Physician.

AMENDED COMPLAINT - 9

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

26.     The STD program defined "**SICKNESS**" as "an illness or disease."

27.     Under the STD program, beginning 7 days after the commencement of his disability, Dr. Nielsen was entitled to be paid his full salary as long as he met the definition of "disabled," for a period of 90 days.  It is undisputed that Dr. Nielsen was unable to find work during that period.

28.     On June 11, 2010, Dr Nielsen's treating psychiatrist, Dr. Debra Hughes, filled out a Unum disability claim form.  Dr. Hughes concluded that the "primary diagnosis preventing the patient from working," was Adult Attention Deficit Disorder.  She checked "yes" in answer to the question "Are there any cognitive deficits or psychiatric conditions that impact function?"  She described Dr. Nielsen's restrictions and limitations as "poor attention, poor concentration, poor working memory, problems with organization and follow through, forgetful."  Dr. Hughes concluded that these limitations resulted in the loss of Dr. Nielsen's job.  The form asked Dr. Hughes to note the patient's Axis V level as described in the DSM IV.  The DSM IV is a reference to the "Diagnostic and Statistical Manual of Mental Disorders," 4th ed., published by the American Psychiatric Association.  According to the DSM IV, Axis V measures the patient's "Global Assessment Functioning" level. This is a 100-point scale that the mental health professional uses to describe the patient's overall level of psychological, social, and occupational functioning.  On this 100-point scale, Dr. Hughes rated Dr. Nielsen at "45-50 (job loss)."  According to the DSM IV, a person with a GAF rating of anywhere from 41 to 50 has "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR <u>any serious impairment</u> in social, <u>occupational</u>, or school <u>functioning</u> (<u>e.g.,</u> no friends, <u>unable to keep a job</u>)" (emphasis added).  In other

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

words, in Dr. Hughes' opinion, Dr. Nielsen's Attention Deficit Disorder was a serious impairment that rendered him unable to keep a job.

29.     Dr. Hughes filled out another Unum disability claim form on June 12, 2010. In addition to repeating some of her statements from the June 11, 2010 form, Dr. Hughes identified the "other conditions that prevent the patient from working" as "anxiety, depression, social awareness deficits." Dr. Hughes's secondary diagnoses were "major depressive disorder recurrent moderate" and "Generalized Anxiety Disorder." Again, Dr. Hughes checked "yes" in answer to the question "Are there any cognitive deficits or psychiatric conditions that impact function?" She described Dr. Nielsen's restrictions and limitations as "severe difficulties with attention, focus, concentration, organization, working memory, hyper____at times, anxiety, misses priorities and social cues from others, slow processing [and] prob[lems]s sequencing." Dr. Hughes noted that these restrictions and limitations were the reason for his recent job loss and had been a lifelong problem for Dr. Nielsen. Dr. Hughes further noted that Dr. Nielsen's recent loss of his job was yet another job failure and that he had failed repeatedly in various medical settings not through lack of intelligence but due to problems with organization and administration. Dr. Hughes added that Dr. Nielsen was "weak with complex processing skills and attention," that his "reading performance is lower and slower," that his "ability to organize himself is impaired," that "social cues are not often picked up so he frequently has trouble adjusting behavior accordingly," and that "he is truly mystified by what has happened."

30.     Nevertheless, Unum denied Dr. Nielsen's STD claim in a letter dated June 25, 2010. It was undisputed that Dr. Nielsen had not worked since May 21, 2010, and that he had no earnings during that time. Unum denied the claim because "you did not stop working

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

because you were instructed to do so by a medical professional." Unum ignored Dr. Hughes's diagnoses and her conclusion that Dr. Nielsen's severe difficulties with attention, focus, concentration, organization, sequencing, working memory, anxiety, understanding priorities, picking up on social cues from others, and his weak processing skills were precisely what had caused him to be fired from his most recent job and were what had caused him to lose other jobs in the past.

31.     Dr. Nielsen appealed Unum's denial of his claim for STD benefits.  On June 27, 2011 Unum denied his appeal.  Unum concluded that Dr. Nielsen did "not have any restrictions and limitations that would prevent him from working at the time that he cease [sic] work."  Again, Unum relied on the nonsensical notion that Dr. Nielsen was disabled only if his physician advised him to cease work.  There was no such requirement in the language of the STD Program.  Instead, the STD Program's definition of "disabled" was simply that the claimant simply be unable to perform the duties that were normally required for his regular occupation.

32.     In denying the STD appeal, Unum simply ignored or summarily dismissed the conclusions of Dr. Hughes, as described in the June 11 and June 12, 2010 statements she had submitted.

33.     In denying the STD appeal, Unum did not contend that Dr. Hughes's diagnoses of Adult Attention Deficit Disorder, Major Depressive Disorder, and Anxiety Disorder were incorrect.  Unum offered no specific evidence to refute Dr. Hughes's conclusion that Adult Attention Deficit Disorder was preventing the patient from working.  Unum offered no specific evidence to refute Dr. Hughes' conclusion that "other conditions that prevent the patient from working" were "anxiety, depression, social awareness deficits."

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

34. In denying the STD appeal, Unum made reference to a neuropsychological evaluation of Dr. Nielsen performed in June 2010 by Dr. David Fordyce. Unum ignored Dr. Fordyce's conclusion that Dr. Nielsen's neuropsychological test results were consistent with Attention Deficit Disorder – Inattentive Type and a Mood Disorder with anxious and depressed features. Unum ignored Dr. Fordyce's conclusion that:

"[H]e would have the best chance of vocational success is [sic] settings that are relatively even paced, structured, and perhaps more linear in nature. He will likely function better in settings with minimal distractions or interruptions, a state of affairs that would be difficult [to] obtain in standard clinical environments." Unum also ignored the following conclusions expressed by Dr. Fordyce on June 14:

> I believe he does possess some impairment in information processing (complex attention and processing speed) that are subtle and hard to measure on neuropsychological testing – though there certainly is an indication of their presence. He also appears to struggle with social intelligence in a way that likely has also compromised his vocational function. Finally, general mood is anxious and at least mildly depressed. These impairments have likely been longstanding, and it sounds like they have impacted in some way virtually every medical environment he has worked in. He clearly has failed at several positions he has worked in, including the most recent. . . . Diagnostically, the history and test results are most consistent with Attention Deficit Disorder – Inattentive Type and a Mood Disorder with anxious and depressed features.

> I believe that he should complete his application for long-term disability income. At the same time, I think he should continue to look for work – but only in a setting that could accommodate his impairments. It will be a challenge to locate a good employment fit. . . . If he is going to have any chance of successful work, it will need to be in a setting that is inherently structured and organized, or provides some accommodation that helps with the difficulties in attention, organization, and effective management of the administrative structure.

35. After Unum denied the appeal of his STD claim, Dr. Nielsen continued to provide Unum with additional information establishing that he was in fact disabled during the

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

1  period for which STD benefits were payable.  Up to the time of the filing of this complaint,

2  however, Unum has continued to deny that Dr. Nielsen is entitled to any STD benefits.

3  **UNUM'S DENIAL OF DR. NIELSEN'S CLAIM FOR LTD BENEFITS**

4      36.     Dr. Nielsen was covered by the LTD Plan.

5      37.     The insurance policy ("policy" or "LTD policy") issued by Unum Life

6  pursuant to the LTD Plan defined "disabled" as follows:

7

8      You are disabled when Unum determines that:
       - you are **limited** from performing the **material and substantial duties** of
       your **regular occupation** due to your **sickness** or **injury**; and

9      - you have a 20% or more loss in your **indexed monthly earnings** due to the
       same sickness or injury.

10      . . .

11     You must be under the regular care of a physician to be considered disabled.

12  Since May 21, 2010, Dr. Nielsen has continuously had a 20% or more loss in his "indexed

13  monthly earnings," as that term is defined in the policy.  Since May 21, 2010, Dr. Nielsen has

14  been continuously under the regular care of a physician.

15      38.     The policy defined "**LIMITED**" as "what you cannot or are unable to do."

16      39.     The policy defined "**MATERIAL AND SUBSTANTIAL DUTIES**" as

17  duties that:

18     - are normally required for the performance of your regular occupation; and
       - cannot be reasonably omitted or modified.

19      40.     The policy defined "**REGULAR OCCUPATION**" as

20

21     the occupation you are routinely performing when your disability begins.
       Unum will look at your occupation as it is normally performed in the national
       economy, instead of how the work tasks are performed for a specific employer

22     or at a specific location.

23  At the time Dr. Nielsen's disability began, his "regular occupation" was Hospice and

24  Palliative Medicine Physician.

25      41.     The policy defined "**SICKNESS**" as

AMENDED COMPLAINT - 14

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

an illness or disease.  Disability must begin while you are covered under the plan."

42.     Dr. Nielsen filed a claim for LTD benefits under the LTD Plan.  In a letter dated April 20, 2012, Unum denied that claim.  As it did in denying Dr. Nielsen's STD claim, Unum concluded that Dr. Nielsen was not disabled under the LTD policy because his medical care providers had not advised him to leave work.  Again, however, nothing in the LTD policy's definition of "disabled" required that a claimant's care providers tell him not to work. The relevant question is whether, due to an illness, the claimant is unable to perform the duties normally required for the performance of his regular occupation claimant.   Unum also based its decision on the fact that Dr. Nielsen had attempted to find work as a physician. Nothing in the policy states that a claimant cannot be considered disabled if he is seeking to find work in his occupation.

43.     Unum also denied Dr. Nielsen's LTD claim because the State had taken no action against his medical license.  The suggestion was that a physician is not disabled as long as the State in which he or she practices has taken no action against his or her medical license. There is nothing in the LTD policy's definition of "disabled" to support this position.

44.     Unum acknowledged the opinion of Dr. Nielsen's treating psychiatrist, Dr. Debra Hughes, that Dr. Nielsen was unable to perform the duties of a physician due to his psychiatric impairment.   But Unum dismissed this opinion entirely.   Its reasoning for dismissing Dr. Hughes' was as follows: "Dr. Hughes noted you always performed well with clinical work and that absent administrative duties such as time constraints and paperwork, you are able to care for patients and their families in a very therapeutic fashion."  The issue is not whether Dr. Nielsen was a threat to the safety of patients with whom he was able to spend large amounts of time.  The issue was, and is, whether Dr. Nielsen's psychiatric condition

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

rendered him unable to perform the duties normally required for the performance of his regular occupation. Unum's position would make sense only if administrative duties, time constraints, and paperwork were not part of the duties normally required of a physician in a modern medical practice. But dealing with administrative responsibilities, dealing successfully with time constraints, and completing paperwork *are* duties normally required of a physician in a modern medical practice. Unum cited no evidence suggesting otherwise.

45. In denying Dr. Nielsen's claim, Unum relied on a comment by Dr. Nielsen's psychotherapist, Dr. Brad Bates, that while Dr. Nielsen had limitations as a physician, he was not unfit for duty as a doctor. Unum's reliance on this observation is yet another example of its faulty logic and unreasonable conclusion. The premise for Unum's denial of Dr. Nielsen's claim was that as long as a physician is not so cognitively or psychologically impaired as to be totally unfit to act as a physician in any setting, then the physician is not disabled. But again, that premise is not supported by the LTD policy's definition of "disabled." If given unlimited amounts of time to spend with each patient, if not required to remember information about multiple patients, if not required to complete chart notes concerning multiple patients in a short time frame, if not required to respond appropriately and in a timely fashion to colleagues and other staff members, if not required to remember to bring his pager to the hospital, if not required to show up on time, if not required to perform other routine administrative duties, and if not required to demonstrate an excellent working memory and an ability to screen out distractions, a physician like Dr. Nielsen may indeed be "fit" to practice medicine in the sense of appropriately diagnosing and treating an extremely limited number of patients. But the ability to perform all of these duties is normally required of every physician in every modern medical facility. Moreover, Dr. Bates diagnosed Dr. Nielsen as suffering

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

from Attention-Deficit/Hyperactivity Disorder, Primarily Inattentive Type, as well as Dysthymic Disorder (an overwhelming, chronic state of depression), acknowledged that Dr. Nielsen can become flustered in situations like morning rounds that require rapid information processing, and recognized that Dr. Nielsen's cognitive and psychological impairments limited his abilities as a physician.

46.    In denying Dr. Nielsen's LTD claim, Unum also claimed that a neuropsychological evaluation conducted by Dr. David Fordyce in June 2010 did not support the conclusion that Dr. Nielsen was disabled.  Dr. Nielsen was referred to Dr. Fordyce for evaluation by the Washington Physicians' Health Program (WPHP).  FHS – Dr. Nielsen's employer until May 21, 2010 -- referred Dr. Nielsen to WPHP.  WPHP, in turn, sent Dr. Nielsen to Dr. Fordyce for evaluation.

47.    As Unum acknowledged, Dr. Fordyce concluded that Dr. Nielsen's neuropsychological test results were consistent with Attention Deficit Disorder – Inattentive Type and a Mood Disorder with anxious and depressed features.   As Unum also acknowledged, Dr. Nielsen's performance on more complex measures of processing speed, attention, and reading comprehension ranged from below average to average.  Dr. Fordyce concluded his initial June 7, 2010 report by saying:

> [H]e would have the best chance of vocational success is [sic] settings that are relatively even paced, structured, and perhaps more linear in nature.  He will likely function better in settings with minimal distractions or interruptions, a state of affairs that would be difficult [to] obtain in standard clinical environments.

48.    On a June 14, 2010 report, which was in Unum's file at the time it denied Dr. Nielsen's LTD claim, Dr. Fordyce wrote:

> I believe he does possess some impairment in information processing (complex attention and processing speed) that are subtle and hard to measure on

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

neuropsychological testing – though there certainly is an indication of their presence. He also appears to struggle with social intelligence in a way that likely has also compromised his vocational function. Finally, general mood is anxious and at least mildly depressed. These impairments have likely been longstanding, and it sounds like they have impacted in some way virtually every medical environment he has worked in. He clearly has failed at several positions he has worked in, including the most recent. . . . Diagnostically, the history and test results are most consistent with Attention Deficit Disorder – Inattentive Type and a Mood Disorder with anxious and depressed features.

I believe that he should complete his application for long-term disability income. At the same time, I think he should continue to look for work – but only in a setting that could accommodate his impairments. It will be a challenge to locate a good employment fit. . . . If he is going to have any chance of successful work, it will need to be in a setting that is inherently structured and organized, or provides some accommodation that helps with the difficulties in attention, organization, and effective management of the administrative structure.

Dr. Nielsen's inability to maintain a job as a physician is not due to a lack of natural intelligence. Indeed, Dr. Fordyce found that on one measure of intelligence Dr. Nielsen was in the 93rd percentile and on another measure was in the 95th percentile.

49. In addition, Dr. Fordyce completed a Unum disability claim form on November 15, 2011. This form was in Unum's file at the time it denied Dr. Nielsen's LTD claim. In the claim form he completed on November 15, 2011, Dr. Fordyce stated that the "primary diagnosis preventing the patient from working," was "ADHD [Attention-Deficit/Hyperactivy Disorder], Mood Disorder with anxiety & depression." His secondary diagnosis was "poor social awareness, poor self-esteem." Dr. Fordyce checked "yes" in answer to the question "Are there any cognitive deficits or psychiatric conditions that impact function?" Asked to identify the "diagnostic or clinical findings [that] support your diagnosis," Dr. Fordyce wrote: "work history, neuropsychological evaluation results."

50. The Unum claim form asked Dr. Fordyce to note the patient's Axis V level as described in the DSM IV. On the 100-point Global Assessment Functioning scale used to

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

describe the patient's overall level of psychological, social, and occupational functioning, Dr. Fordyce rated Dr. Nielsen at 50. Again, according to the DSM IV, a person with a GAF rating of anywhere from 41 to 50 has "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" (emphasis added).

51.     In the November 15, 2011 claim form, Dr. Fordyce described Dr. Nielsen's restrictions and limitations as "He would require a supported & structured working setting to succeed." Dr. Fordyce concluded by saying:

> Dr. Nielsen would likely be able to work as a physician only in a highly organized & supported work environment. He has not been able to attend to, remember, and follow the normal structure of the medical environments he has worked in.

Asked to state when he expected improvement in the patient's functional capacity, Dr. Fordyce supplied no answer.

52.     In summary, Dr. Fordyce concluded:

- that Dr. Nielsen suffered from Attention Deficit Disorder – Inattentive Type and a Mood Disorder with anxious and depressed features, and that these disorders were preventing him from working;

- that as a result of these conditions Dr. Nielsen's overall level of functioning was at a level indicating a serious impairment in occupational functioning;

- that Dr. Nielsen's performance on more complex measures of processing speed, attention, and reading comprehension ranged from below average to average, and that his information processing was impaired;

- that Dr. Nielsen's impaired social intelligence had likely compromised his vocational function;

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

- that all of these disorders and impairments had likely impacted virtually every medical environment in which Dr. Nielsen had worked, and that Dr. Nielsen had not been able to attend to, remember, and follow the normal structure of the medical environments in which he had worked;

- that Dr. Nielsen's only chance of maintaining employment as a physician would be in a setting that presents minimal distractions or interruptions and that is inherently structured and organized, or provides some accommodation that helps with his difficulties in attention, organization, and effective management of the administrative structure; and

- that such a setting would be difficult to find in standard clinical environments.

53.     Nevertheless, in its April 20, 2012 denial of Dr. Nielsen's LTD claim, Unum concluded that Dr. Nielsen had neither "cognitive deficits or a behavioral health condition that would preclude you from performing the material and substantial duties of your own occupation."  Ignoring or dismissing the conclusions of Dr. Hughes and Dr. Fordyce, Unum instead chose to base its decision on the opinions of Unum's "onsite physicians" – i.e., physicians on Unum's payroll who never met or tested Dr. Nielsen.  In the opinion of these "onsite physicians," the information they reviewed did not support the conclusion "that you ceased work and remained out of work as the result of impairing psychiatric illness."

54.     In a letter dated March 18, 2013, Unum denied Dr. Nielsen's appeal of Unum's initial decision on his LTD claim.

55.     Unum's rejection of the LTD appeal denial did not even mention the findings of Dr. Debra Hughes, Dr. Nielsen's treating psychiatrist in 2010.  In June 2010, Dr. Hughes:

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

- determined that the "primary diagnosis prevent[ing] the patient from working," was Adult Attention Deficit Disorder;

- observed that there were cognitive deficits or psychiatric conditions that impacted Dr. Nielsen's function;

- noted that Dr. Nielsen's restrictions and limitations were "severe difficulties with attention, focus, concentration, organization, working memory, hyper____at times, anxiety, misses priorities and social cues from others, slow processing [and] prob[lems]s sequencing";

- concluded that these limitations resulted in the loss of Dr. Nielsen's job;

- on the 100-point Global Assessment Functioning scale, rated Dr. Nielsen's functioning at "45-50 (job loss)", meaning that he had a serious impairment in occupational functioning; and

- observed that "other conditions that prevent the patient from working" were "anxiety, depression, social awareness deficits."

56.     Unum's denial of Dr. Nielsen's appeal mentioned Dr. Fordyce's June 2010 evaluation and acknowledged Dr. Fordyce's diagnosis of Attention Deficit Disorder – Inattentive Type and a Mood Disorder with anxious and depressed features.  But Unum completely ignored all of Dr. Fordyce's conclusions as described in paragraphs 45 through 50 above.

57.     In denying the LTD appeal, Unum claimed that Dr. Nielsen's "history" did not support the diagnosis of attention deficit disorder because what Dr. Nielsen reported to various medical professionals over the last few years did not refer to behaviors often seen in children impaired with attention deficit disorder.  In other words, Unum concluded that Dr.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

Nielsen has not suffered from attention deficit disorder in the years 2010-2013 simply because Dr. Nielsen himself did not say that he displayed symptoms of the disorder as a child. This is ludicrous. The earliest record of any psychological or psychiatric evaluation of Dr. Nielsen is from the year 2003. There are no records of any such evaluations having occurred during his childhood or indeed at any time before age 48. The fact that Dr. Nielsen did not, in his recent discussions with his care providers, report having symptoms of ADD when he was a child does not mean that he had no such symptoms in his childhood. More importantly, the majority of the psychological or psychiatric professionals who have evaluated Dr. Nielsen over the last several years have indeed diagnosed him with ADD.

58. In denying the appeal, Unum also contended that because Dr. Nielsen had been looking for work in the period since his employment was terminated in May 2010, this meant that he had no functional impairment. In other words, Unum concluded that because Dr. Nielsen *thought* he might be able to get work as a physician and tried to obtain such work, it necessarily followed that he was capable of getting and holding a job in his occupation. By using this conclusion to support its denial of Dr. Nielsen's appeal, Unum was effectively punishing Dr. Nielsen for trying to find work. Moreover, Unum's conclusion flies in the face of the evidence from Dr. Fordyce that Dr. Nielsen's only chance of maintaining employment as a physician would be in a setting that presents minimal distractions or interruptions and that is inherently structured and organized, or provides some accommodation that helps with his difficulties in attention, organization, and effective management of the administrative structure – a setting that Dr. Fordyce said would be difficult to find in standard clinical environments.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

59.     In denying the LTD appeal, Unum also relied on selected statements by Dr. Nielsen to some of his medical care providers in late 2011, 2012, or 2013 about how he was feeling at that time.   Unum carefully chose a few statements indicating that Dr. Nielsen thought he was doing well and/or feeling well. Unum even sought to justify its denial of the LTD appeal by seizing on alleged statements by Dr. Nielsen in late 2011, 2012, or 2013 to the effect that he was feeling well because of the lack of work pressures and associated stress.  By citing these alleged statements, Unum was suggesting that Dr. Nielsen was suddenly "cured" and therefore was fully able to obtain and maintain employment as a physician.    These statements in no way establish that Dr. Nielsen had suddenly become capable of consistently demonstrating the high degree of focus, concentration, rapid mental processing, attention, organization, working memory, sequencing, and social perceptiveness necessary to obtain and hold a job as a physician.  In addition, these statements made in late 2011, 2012 and 2013 have no bearing on the question of whether he was disabled in 2010 and most of 2011.

60.     In addition, at the time that Unum denied the LTD appeal, Unum knew that the very nature of at least one of Dr. Nielsen's illnesses deprived him of the ability to understand and measure his own feelings and level of cognitive performance.  See discussion below of findings of Dr. Richard Adler.  In addition, in a telephone discussion with one of Unum's on-staff physicians, Dr. Debra Hughes noted that Dr. Nielsen has poor insight into his problems with employers or in interactions with others, and that he typically thinks he is doing fine when in fact he is not.  Thus, it was both incorrect and unreasonable for Unum to conclude, based on Dr. Nielsen's own reports in late 2011, 2012 and 2013 about how he was feeling or doing, that Dr. Nielsen was capable of obtaining and maintaining employment as a physician.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

61.     In addition to all of the information that was available to Unum when it denied the STD claim and when it initially denied the LTD claim, Unum also had before it when it denied the LTD appeal the October 29, 2012 evaluation prepared by Dr. Richard Adler. Dr. Adler is a Board-Certified Psychiatrist and a Clinical Instructor at the University of Washington Department of Psychiatry and Behavioral Sciences.

62.     Dr. Adler interviewed Dr. Nielsen, administered a series of psychological tests to him, and reviewed his records.

63.     Dr. Adler diagnosed Dr. Nielsen as suffering from Anxiety Disorder (with likely Posttraumatic Stress Disorder features -- including dissociative symptoms), Depressive Disorder, and Attention Deficit Disorder.  Dissociative experiences are those in which a person may be involved in behavior but not fully recollect what has transpired.   On the 100-point Global Assessment Functioning scale used to describe the patient's overall level of psychological, social, and occupational functioning, Dr. Adler rated Dr. Nielsen at 45.

64.     Dr. Adler concluded that Dr. Nielsen "has one or more psychiatric conditions (as provided above [in his diagnosis]) -- any of which alone and most certainly being present in combination, which materially make him unsuitable to practice Internal Medicine presently."

65.     Dr. Adler further concluded: "It is unlikely, in my opinion, that any reasonable medical facility would hire Dr. Nielsen to practice Internal medicine if they were made fully aware of his problems understanding his feelings, the feelings of others and his propensity to dissociate."

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

66.     Finally, Dr. Adler concluded: "In the context of the definition of disability provided by UNUM (i.e. 'you are limited from performing material and substantial duties of your regular occupation due to your sickness') it is my opinion that Dr. Nielsen IS disabled."

67.     With regard to Dr. Nielsen's inability to understand his own feelings and those of others, and propensity to dissociate, Dr. Adler noted that Dr. Nielsen suffered from alexithymia.  Alexithymia is the cognitive-affective disturbance that affects the way individuals experience and express their emotions – i.e., a diminished ability to identify and describe one's feelings.  As a profound illustration of this problem, Dr. Adler noted that while Dr. Nielsen's responses on some of the psychological tests reflected meaningful symptoms of impairment and distress, Dr. Nielsen at the same time characterized himself as functioning at a level of 80 out of 100 and as having a mood that was a 10 out of 10.  Dr. Adler described this contrast as a "stunning example of how seriously 'out of touch' Dr. Nielsen is with his feelings and circumstances."  Alexithymia also results in difficulty in distinguishing and interpreting the emotions of others. This is consistent with Dr. Hughes's observation that Dr. Nielsen had social awareness deficits and that he had difficulty picking up on social cues and therefore frequently had trouble adjusting behavior accordingly.  Dr. Adler also noted that alexithymia is significantly correlated with dissociative experiences.

68.     With regard to Dr. Nielsen's attention deficit disorder, Dr. Adler noted that Dr. Nielsen's results on the Conners' Continuous Performance Test-II better matched the clinical profile of persons with ADD than the non-clinical profile from the general population.  Dr. Adler also noted that on one of the other tests, the Validity Indicator Profile (VIP) non-verbal subtest, Dr. Nielsen took longer to complete the subtest than any other person Dr. Adler had

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

ever tested. In addition, as the items in this test became more difficult, there was a prominent and progressive deterioration in Dr. Nielsen's performance.

69.     At the time it denied Dr. Nielsen's LTD appeal, Unum also had in its file a report from a vocational expert, John Fountaine. Mr. Fountaine holds a Master's Degree in Rehabilitation Counseling and has practiced continuously in the field of rehabilitation counseling and vocational assessment since 1992. Mr. Fountaine interviewed Dr. Nielsen and his wife, reviewed Dr. Nielsen's records, and discussed Dr. Nielsen's case with Dr. Adler. Mr. Fountaine concluded that the reason for Dr. Nielsen's loss of several jobs as a physician was his cognitive, psychological or emotional insufficiencies. In Mr. Fountaine's professional opinion, the kind of structured environment and sheltered work in which Dr. Nielsen might possibly succeed is simply not available. He further concluded that Dr. Nielsen is unemployable as a result of a complicated combination of cognitive, psychological and emotional impairments.

## THE UNITED STATES SOCIAL SECURITY ADMINISTRATION HAS FOUND THAT DR. NIELSEN HAS BEEN DISABLED SINCE MAY 28, 2010

70.     On May 13, 2013, the U.S. Social Security Administration determined under its rules that Dr. Nielsen has been continuously disabled since May 28, 2010. Through counsel, Dr. Nielsen advised Unum of the SSA decision. To be entitled to a Social Security Disability award, the claimant must suffer from an impairment or impairments "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A). This is a far more stringent standard

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

than the standard under which Unum determined that Dr. Nielsen is *not* disabled. Despite being aware of the Social Security Disability award, Unum has not altered its position concerning its denial of LTD or STD benefits.

### FIRST CAUSE OF ACTION: BREACH OF CONTRACT AGAINST CHI AND FHS – STD BENEFITS

71. Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 70, above.

72. The CHI STD Program constituted a contract between CHI and FHS's employees covered by the Program. Dr. Nielsen was covered by the STD Program. His labor for FHS – an affiliate of CHI – constituted consideration for CHI's promise to provide benefits under the STD Program.

73. In consideration for Dr. Nielsen's promised labor, FHS promised to provide him with benefits under the terms of the STD Program. This exchange of promises constituted a contract.

74. Dr. Nielsen performed all of his obligations under the contracts with CHI and FHS.

75. Dr. Nielsen qualified for STD benefits under the terms of the STD Program. CHI and FHS breached their contracts with Dr. Nielsen by failing to pay Dr. Nielsen the benefits to which he was entitled under the STD Program.

76. Dr. Nielsen incurred damages as a result of the breach of the contract by CHI and FHS. Under the terms of the STD Program, Dr. Nielsen is entitled to recover from CHI and FHS the full amount of his salary over the 90 day period that began 7 days after the date his disability began (May 21, 2010).

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

## SECOND CAUSE OF ACTION: BREACH OF CONTRACT
## AGAINST UNUM LIFE AND UNUM GROUP – STD BENEFITS

77.     Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 76, above.

78.     Unum Life and Unum Group (collectively Unum) entered into a contract with CHI to provide administrative claims handling services for the CHI STD Program.  CHI paid compensation to Unum for these services.   In return, Unum promised to make benefits determinations in accordance with the terms of the STD Program.

79.     As a participant in the STD Program, Dr. Nielsen was a third-party beneficiary of the contract between CHI and Unum.  Pursuant to the contract between CHI and Unum, Unum owed Dr. Nielsen a contractual duty to decide his claim for benefits in accordance with the terms of the STD Program.   Dr. Nielsen performed all of his obligations under the contract between CHI and Unum.

80.     Dr. Nielsen qualified for STD benefits under the terms of the STD Program. Unum breached the contract and breached its contractual duty to Dr. Nielsen by denying his claim, denying his appeal, and to this day denying his right to benefits.

81.     Dr. Nielsen incurred damages as a result of Unum's breach of its contract with CHI and Unum's breach of its contractual duties to Dr. Nielsen.  Under the terms of the STD Program, Dr. Nielsen is entitled to recover from Unum the full amount of his salary over the 90 day period that began 7 days after the date his disability began (May 21, 2010).

## THIRD CAUSE OF ACTION: BREACH OF CONTRACT
## AGAINST CHI AND FHS – LTD BENEFITS

82.     Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 81, above.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

83.     In consideration for Dr. Nielsen's promised labor, FHS promised to provide with him with benefits under the terms of the LTD Plan.  This exchange of promises constituted a contract.

84.     The LTD Plan constituted a contract between CHI and FHS's employees covered by the LTD Plan.  Dr. Nielsen was covered by the LTD Plan.  His labor for FHS – an affiliate of CHI – constituted consideration for CHI's promise to provide benefits under the terms of the LTD Plan.  In addition, as the Plan Administrator under the LTD Plan, CHI owed Dr. Nielsen a contractual duty to ensure that benefits were paid to him in accordance with the terms of the LTD Plan.

85.     Dr. Nielsen performed all of his obligations under the contracts with CHI and FHS.

86.     Dr. Nielsen qualified, and continues to be qualified, for LTD benefits under the terms of the LTD Plan.  CHI and FHS breached their contractual duties to Dr. Nielsen by failing to pay Dr. Nielsen the benefits to which he was entitled under the LTD Plan, and/or by failing to ensure that Unum paid Dr. Nielsen the benefits to which he was entitled under the LTD Plan

87.     Dr. Nielsen has incurred damages as a result of the breach of the contract by CHI and FHS with respect to LTD benefits.  Dr. Nielsen is entitled to recover from CHI and FHS all the benefits to which he was and is entitled under the terms of the LTD Plan.  These benefits include the payment of monthly benefits of 60% of his gross monthly income just prior to the initial date of his disability, adjusted for inflation.  Dr. Nielsen is entitled to these monthly benefits from the end of the "elimination period" (as described in the LTD Plan and the LTD policy) to the date of entry of judgment in this action.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

**FOURTH CAUSE OF ACTION: BREACH OF CONTRACT
AGAINST UNUM LIFE– LTD BENEFITS UNDER
THE LTD INSURANCE POLICY**

88.     Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 87, above.

89.     Unum Life entered into an insurance contract with CHI to provide LTD benefits to employees of FHS.  CHI paid the premiums.  In return, Unum Life issued the LTD policy to CHI.

90.     As a participant in the LTD Plan, Dr. Nielsen was a third-party beneficiary of the LTD insurance policy provided by Unum Life to CHI.  Unum Life owed Dr. Nielsen a contractual duty to pay Dr. Nielsen any and all benefits to which he became entitled under the terms of the LTD policy.  Dr. Nielsen performed all of his obligations under the LTD policy.

91.     Dr. Nielsen qualified for LTD benefits under the terms of the LTD policy.  Unum Life breached the contract and breached its contractual duty to Dr. Nielsen by refusing to pay him the benefits to which he was and is entitled under the terms of the LTD policy.

92.     Dr. Nielsen has suffered damages as a result of Unum Life's breach of its contractual duties under the LTD policy.   Dr. Nielsen is entitled to recover from Unum Life all the benefits to which he is entitled under the terms of the LTD Policy, as described above.

**FIFTH CAUSE OF ACTION: BREACH OF CONTRACT
AGAINST LTD PLAN**

93.     Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 92, above.

94.     The LTD Plan is an employee welfare benefit plan established by CHI to provide LTD benefits to employees of CHI and affiliated organizations such as FHS.  Dr. Nielsen was a participant in the LTD Plan.

95.     In consideration of Dr. Nielsen's labor for FHS (an affiliate of CHI), the LTD Plan promised to pay benefits to Dr. Nielsen under the terms of the LTD Plan.  The LTD Plan

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

owed Dr. Nielsen a contractual duty to pay Dr. Nielsen any and all benefits to which he became entitled under the terms of the LTD Plan.

96.     Dr. Nielsen performed all of his obligations under the LTD Plan.

97.     Dr. Nielsen qualified, and continues to be qualified, for LTD benefits under the terms of the LTD Plan.  The LTD Plan breached its contractual duty by failing to pay Dr. Nielsen the benefits to which he was entitled under the LTD Plan, and/or by failing to ensure that Unum Life paid Dr. Nielsen the benefits to which he was entitled under the LTD Plan.

98.     Dr. Nielsen has incurred damages as a result of the breach of the contract by the LTD Plan.  Dr. Nielsen is entitled to recover from the LTD Plan all the benefits to which he was and is entitled under the terms of the LTD Plan, as described above.

## SIXTH CAUSE OF ACTION: DECLARATORY JUDGMENT AGAINST ALL DEFENDANTS DECLARING ONE-YEAR LIMIT ON BENEFITS FOR DISABILTY DUE TO MENTAL ILLNESS TO BE UNENFORCEABLE

99.     Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 98, above.

100.     Under both the LTD Plan and the LTD Policy, if Dr. Nielsen's disability were due to an illness other than mental illness, he would be entitled to benefits until he reached age 65 -- a period of 10 years since he was 55 at the time his disability began.  But both the LTD Plan and the LTD Policy limit the payment of benefits to a maximum of one year if the disability is due to mental illness.

101.     None of the defendants has paid Dr. Nielsen *any* benefits so far.   Since no benefits have been paid, none of the defendants has yet terminated the payment of benefits based on the mental illness limitation.

102.     But if the Court or the jury determines that Dr. Nielsen is indeed disabled under the terms of the LTD Plan and the LTD Policy and that his disability continued more

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

than one year beyond the elimination period, defendants will likely assert that they owe Dr. Nielsen no more than one year of benefits, based on the mental illness limitation.

103.     The mental illness limitation is illegal, void, and unenforceable for one or more of the following reasons:

a.     It violates the Washington Law Against Discrimination (WLAD) (RCW ch. 49.60);

b.     It violates Title III of the Americans with Disabilities Act (ADA);

c.     It is void as against public policy;

d.     Because such a large percentage of disabled persons are disabled due to mental illness, the general promise in the LTD Plan and the LTD policy to pay benefits over a period of many years is effectively an illusory promise;

e.     Because the definition of "mental illness" in the LTD Plan and the LTD policy is so broad as to make the mental illness limitation an exclusion that effectively swallows the promised coverage; and

f.     It otherwise violates the law of the United States, the State of Washington (where its effects are felt in this case), and/or the State of Colorado (where the LTD policy was issued to CHI).

104.     A justiciable controversy exists between Dr. Nielsen and the defendants as to whether the mental illness limitation is illegal, void, and/or unenforceable.  The Court should enter a judgment declaring the mental illness limitation to be illegal, void, and/or unenforceable and declaring that Dr. Nielsen is entitled to LTD benefits from the end of the elimination period to the date when judgment is entered, and for as long in the future (until he

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

reaches age 65) as Dr. Nielsen continues to meet the definition of "disabled" under the terms of the LTD Plan and LTD policy.

## SEVENTH CAUSE OF ACTION: VIOLATION OF THE WLAD BY FHS

105.    Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 104, above.

106.    On its face the WLAD exempts religious non-profit organizations from its definition of "employer."  FHS is a religious non-profit organization.

107.    In December of 2012, however, the United States District Court for the Western District of Washington certified the following questions to the Washington Supreme Court:

> 1. The Washington Law Against Discrimination excludes religious non-profit organizations from its definition of "employer" (Wash. Rev. Code § 49.60.040(11)). Such entities are therefore facially exempt from the WLAD's prohibition of discrimination in the workplace. Does this exemption violate Wash. Const. Article I, §11 or §12?
>
> 2. If not, is Wash. Rev. Code § 49.60.040(11)'s exemption unconstitutional as applied to an employee claiming that the religious non-profit organization discriminated against him for reasons wholly unrelated to any religious purpose, practice, or activity?

A ruling from the Washington Supreme Court is pending.

108.    By providing their employees with an LTD Plan and an LTD policy that included the mental illness limitation described above, FHS discriminated against Dr. Nielsen and other FHS employees on the basis of their mental disability.  This is a reason wholly unrelated to any religious purpose, practice, or activity.  Thus, if the Washington Supreme Court answers either of the certified questions in the affirmative, FHS is not exempt from the WLAD.

AMENDED COMPLAINT - 33

109.    The WLAD prohibits discrimination in the terms of employment (including benefits) based on mental disability.   By providing their employees with an LTD Plan and an LTD policy that included the mental illness limitation described above (i.e., by providing lesser benefits to employees with mental disabilities than to employees with physical disabilities), FHS discriminated against Dr. Nielsen and other FHS employees on the basis of their mental disability in violation of the WLAD.

110.    When defendants assert that Dr. Nielsen is entitled to no more than one year of LTD benefits based on the mental illness limitation, Dr. Nielsen will suffer resulting damage.

111.    Pursuant to the WLAD, the Court should grant declaratory and injunctive relief declaring the mental illness limitation to be illegal, void, and unenforceable, enjoining FHS from enforcing the mental illness limitation, and ordering FHS to pay LTD benefits to Dr. Nielsen from the end of the elimination period to the date when judgment is entered, and for as long in the future (until he turns 65) as Dr. Nielsen continues to meet the definition of "disabled" under the terms of the LTD Plan and LTD policy.

## EIGHTH CAUSE OF ACTION: VIOLATION OF TITLE III OF THE ADA BY UNUM LIFE

112.    Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 111, above.

113.    Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services ... of any place of public accommodation ...." 42 U.S.C. § 12182(a). That title provides further that "[i]t shall be discriminatory to subject an individual or class of individuals on the basis of a disability ... directly, or through contractual, licensing or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, advantages or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i). In

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

addition, Title III forbids "afford[ing] an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

114.    Title III's prohibition against disability discrimination applies to the substance of employee benefit plans and to an insurance company's denial of insurance coverage.

115.    By offering Dr. Nielsen less coverage for his mental disability than it offered to persons with physical disabilities, Unum Life denied him the "full and equal enjoyment" of his benefits in violation of Title III of the ADA.

116.    When Unum Life asserts that Dr. Nielsen is entitled to no more than one year of LTD benefits based on the mental illness limitation, Dr. Nielsen will suffer resulting damage.

117.    Pursuant to Title III of the ADA, the Court should grant declaratory and injunctive relief declaring the mental illness limitation to be illegal, void, and unenforceable, and prohibiting Unum Life from enforcing the mental illness limitation.

## NINTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY BY UNUM LIFE AND UNUM GROUP

118.    Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 117, above.

119.    As the insurer and claim administrator for the LTD Plan, Unum Life and Unum Group (collectively "Unum") owed participants in the LTD Plan, including Dr. Nielsen, a fiduciary duty.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

120.     Unum breached its fiduciary duty by denying benefits to Dr. Nielsen in violation of the terms of the LTD Plan and LTD policy, and placing its own financial interests ahead of the interests of Dr. Nielsen.

121.     Dr. Nielsen has incurred damages as a result of this breach of fiduciary duty by Unum.  Dr. Nielsen is entitled to recover from Unum all the benefits to which he was and is entitled under the terms of the LTD Plan and LTD policy.  These benefits include the payment of monthly benefits of 60% of his gross monthly income just prior to the initial date of his disability, adjusted for inflation.  Dr. Nielsen is entitled to these monthly benefits from the end of the "elimination period" (as described in the LTD Plan and the LTD policy) to the date of entry of judgment in this action.

122.     As the Claims Administrator under the STD Program, Unum owed participants in the STD Program, including Dr. Nielsen, a fiduciary duty.  Although Unum was not the insurer of the STD Program, it was the insurer of the LTD Plan.  Unum knew that if it determined that Dr. Nielsen was entitled to STD benefits, this would likely mean that Dr. Nielsen would be entitled to benefits under the LTD Plan and LTD policy.  Since Unum was the insurer of the LTD Plan and LTD policy, Unum had a strong financial incentive to deny Dr. Nielsen's STD claim.  Unum breached its fiduciary duty by denying benefits to Dr. Nielsen in violation of the terms of the STD Program, and placing its own financial interests ahead of the interests of Dr. Nielsen.

123.     Dr. Nielsen incurred damages as a result of Unum's breach of its fiduciary duty with respect to the STD Program.  Dr. Nielsen is entitled to recover from Unum the full amount of his salary over the 90 day period that began 7 days after the date his disability began (May 21, 2010).

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

## TENTH CAUSE OF ACTION: INSURANCE
## BAD FAITH AGAINST UNUM

124.    Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 123, above.

125.    Washington law, including RCW 48.30.010, imposes on an insurer a duty of good faith requiring that all its actions be actuated by good faith, requiring it to abstain from deception, and requiring it to practice honesty and equity in all matters related to the business of insurance.  The duty of good faith requires an insurer to conduct a reasonable investigation before refusing to pay a claim submitted by its insured. An insurer must also have a reasonable justification before refusing to pay a claim.  An insurer who refuses to pay a claim, without conducting a reasonable investigation or without having a reasonable justification, fails to act in good faith.

126.    As described above, Unum's denials of Dr. Nielsen's claims were unreasonable, frivolous and/or unfounded, and it failed to conduct a reasonable investigation before denying Dr. Nielsen's claims.

127.    Unum's insurance bad faith proximately caused Dr. Nielsen to suffer damage, including  mental anguish, suffering, emotional distress, loss of benefits, loss of peace of mind, and any other damages permitted by law in an amount to be determined at or before trial.

## ELEVENTH CAUSE OF ACTION: VIOLATION
## OF CONSUMER PROTECTION ACT BY UNUM

128.    Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 127, above.

129.    By failing to conduct a reasonable investigation before denying Dr. Nielsen's claims and by failing to have a reasonable justification for denying those claims (all as described above), Unum committed one or more unfair or deceptive acts or practices in

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

violation of the Washington Consumer Protection Act (CPA).

130.    These unfair or deceptive acts or practices occurred in trade or commerce.

131.     These unfair or deceptive acts or practices impacted the public interest, since the Legislature has declared that the business of insurance impacts the public interest. RCW 48.01.030.

132.    Unum's unfair or deceptive acts or practices have caused injury to Dr. Nielsen's business or property by depriving him of insurance benefits to which he is entitled.

133.    The injury to Dr. Nielsen's business or property is causally linked to Unum's unfair or deceptive acts or practices.

134.    Pursuant to the CPA, Dr. Nielsen is entitled to recover from Unum his actual damages, treble damages, and his reasonable attorneys' fees and costs in this action.

## TWELFTH CAUSE OF ACTION: VIOLATION
## OF INSURANCE FAIR CONDUCT ACT ("IFCA") BY UNUM

135.    Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 134, above.

136.    Unum has violated the Washington Insurance Fair Conduct Act (IFCA), RCW ch. 48.30, by, among other acts, (a) unreasonably denying claims for coverage and payment of benefits, in violation of RCW 48.30.015; (b) refusing to pay claims without conducting a reasonable investigation, in violation of WAC 284-30-330(4); and (c) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim, in violation of WAC 284-30-330(13).

137.    Unum violated IFCA by ignoring or summarily dismissing the findings and conclusions of Dr. Nielsen's treating physicians and other medical professionals who have examined him that he suffers from Adult Attention Deficit Disorder, anxiety, depression, and social awareness deficits, and that because of these impairments he has been continuously

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

unable to perform the material and substantial duties of his regular occupation since May 21, 2010.

138. Unum violated IFCA by ignoring or summarily dismissing the findings and conclusions of Dr. Nielsen's treating physicians and other medical professionals who have examined him that Dr. Nielsen's "Global Assessment Functioning" ("GAF") level since May 21, 2010 has been in the range of 45-50 on a 100-point scale. The GAF is a scale that the mental health professionals use to describe the patient's overall level of psychological, social, and occupational functioning. According to the "Diagnostic and Statistical Manual of Mental Disorders," 4th ed., published by the American Psychiatric Association ("DSM IV"), a person with a GAF rating of anywhere from 41 to 50 has "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" (emphasis added);

139. Unum violated IFCA by ignoring or summarily dismissing the findings and conclusions of Dr. Nielsen's treating physicians and other medical professionals who have examined him that since May 21, 2010 Dr. Nielsen has had cognitive deficits and psychiatric conditions that impact his ability to function.

140. Unum violated IFCA by ignoring or summarily dismissing the findings and conclusions of Dr. Nielsen's treating physicians and other medical professionals who have examined him that since May 21, 2010 Dr. Nielsen has been limited by poor attention, poor concentration, poor working memory, forgetfulness, slow processing, problems with organization, problems with sequencing, and problems with follow through.

141. Unum violated IFCA by denying Dr. Nielsen's claims for STD and LTD benefits because, in Unum's words, "you did not stop working because you were instructed to

AMENDED COMPLAINT - 39

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

do so by a medical professional." Unum relied on the nonsensical notion that Dr. Nielsen was disabled only if his physician advised him to cease work. There was no such requirement in the language of the STD Program or the LTD policy. Instead, the STD Program and the LTD Policy defined "disabled" simply as being unable, due to his sickness, to perform the duties that were normally required for his regular occupation.

142. Unum violated IFCA by denying Dr. Nielsen's LTD claim based on the fact that Dr. Nielsen had attempted to find work as a physician. Nothing in the policy states that a claimant cannot be considered disabled if he is seeking to find work in his occupation.

143. Unum violated IFCA by denying Dr. Nielsen's LTD claim because the State had taken no action against his medical license. The suggestion was that a physician is not disabled as long as the State in which he or she practices has taken no action against his or her medical license. There is nothing in the LTD policy's definition of "disabled" to support this position.

144. Unum violated IFCA by denying Dr. Nielsen's LTD claim because of a comment by his treating physician that Dr. Nielsen had performed well with clinical work and that absent administrative duties such as time constraints and paperwork, he was able to care for patients and their families in a very therapeutic fashion. The issue is not whether Dr. Nielsen was a threat to the safety of patients with whom he was able to spend large amounts of time, undistracted by the needs of other patients, the need to record information concerning patients, phone calls, emails, other interruptions, etc. The issue was, and is, whether Dr. Nielsen's psychiatric condition rendered him unable to perform the duties normally required for the performance of his regular occupation. Unum's position would make sense only if administrative duties, time constraints, and paperwork were not part of the duties normally

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

required of a physician in a modern medical practice. But dealing with administrative responsibilities, dealing successfully with time constraints, and completing paperwork *are* duties normally required of a physician in a modern medical practice. Unum cited no evidence suggesting otherwise.

145. Unum violated IFCA by denying Dr. Nielsen's LTD claim because of a comment by his psychotherapist that while Dr. Nielsen had limitations as a physician, he was not unfit for duty as a doctor. Unum's reliance on this observation is yet another example of its faulty logic and unreasonable conclusion. The premise for Unum's denial of Dr. Nielsen's claim was that as long as a physician is not so cognitively or psychologically impaired as to be totally unfit to act as a physician in any setting, then the physician is not disabled. But again, that premise is not supported by the LTD policy's definition of "disabled." If given unlimited amounts of time to spend with each patient, if not required to remember information about multiple patients, if not required to complete chart notes concerning multiple patients in a short time frame, if not required to respond appropriately and in a timely fashion to colleagues and other staff members, if not required to remember to bring his pager to the hospital, if not required to show up on time, if not required to perform other routine administrative duties, and if not required to demonstrate an excellent working memory and an ability to screen out distractions, a physician like Dr. Nielsen may indeed be "fit" to practice medicine in the sense of appropriately diagnosing and treating an extremely limited number of patients. But the ability to perform all of these duties is normally required of every physician in every modern medical facility. Again, Unum cited no evidence suggesting otherwise. Moreover, the same psychotherapist diagnosed Dr. Nielsen as suffering from Attention-Deficit/Hyperactivity Disorder, Primarily Inattentive Type, as well as Dysthymic Disorder (an

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

overwhelming, chronic state of depression), acknowledged that Dr. Nielsen can become flustered in situations like morning rounds that require rapid information processing, and recognized that Dr. Nielsen's cognitive and psychological impairments limited his abilities as a physician.

146. Unum violated IFCA by continuing to deny Dr. Nielsen's LTD claim based on selected statements by Dr. Nielsen to some of his medical care providers in late 2011, 2012, or 2013 about how he was feeling at that time. Unum carefully chose a few statements indicating that Dr. Nielsen thought he was doing well and/or feeling well. Unum even sought to justify its denial of the LTD appeal by seizing on alleged statements by Dr. Nielsen in late 2011, 2012, or 2013 to the effect that he was feeling well because of the lack of work pressures and associated stress. By citing these alleged statements, Unum was suggesting that Dr. Nielsen was suddenly "cured" and therefore was fully able to obtain and maintain employment as a physician. These statements in no way establish that Dr. Nielsen had suddenly become capable of consistently demonstrating the high degree of focus, concentration, rapid mental processing, attention, organization, working memory, sequencing, and social perceptiveness necessary to obtain and hold a job as a physician. In addition, these statements made in late 2011, 2012 and 2013 have no bearing on the question of whether he was disabled in 2010 and most of 2011. Moreover, at the time that Unum continued to deny the LTD claim, Unum knew that the very nature of at least one of Dr. Nielsen's illnesses deprived him of the ability to understand and measure his own feelings and level of cognitive performance. As one of Dr. Nielsen's treating physicians told Unum, Dr. Nielsen has poor insight into his problems with employers and into his interactions with others, and he typically thinks he is doing fine when in fact he is not. Thus, it was both incorrect and

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

1    unreasonable for Unum to conclude, based on Dr. Nielsen's own reports in late 2011, 2012

2    and 2013 about how he was feeling or doing, that Dr. Nielsen was capable of obtaining and

3    maintaining employment as a physician.

4           147.    Dr. Nielsen suffered damages as a proximate result of Unum's violation of

5    IFCA.

6           148.    Dr. Nielsen complied with RCW 48.30.015(8) by giving Unum and the

7    Washington Insurance Commissioner notice of the basis for his IFCA claim more than twenty

8    days before filing this Amended Complaint.  Unum has not changed its position and has not

9    resolved the basis for Dr. Nielsen's IFCA claim.

10

11                   **THIRTEENTH CAUSE OF ACTION: AS AGAINST**
                     **UNUM, CHI, AND THE LTD PLAN -- WRONGFUL DENIAL**
12                   **OF BENEFITS, BREACH OF FIDUCIARY DUTY,**
                     **AND EQUITABLE RELIEF UNDER ERISA**
13

14           149.    Dr. Nielsen re-alleges, as if restated herein, paragraphs 1 through 148, above.

15           150.    ERISA does not apply to the LTD Plan, the LTD Policy, the STD Program, or

16   to this case because the LTD Plan and the STD Program are both "church plans," and because

17   CHI did not properly elect to have either the LTD Plan or the STD Program treated as being

18   subject to ERISA.   In addition, Unum, the LTD Plan, and CHI have admitted that Dr.

19   Nielsen's claims are not governed by ERISA.

20           151.    In the alternative, however, if this Court determines that ERISA applies to this

21   action and that it preempts any of Dr. Nielsen's claims, Dr. Nielsen asserts the following

22   cause of action based on ERISA.

23           152.    For the reasons set forth in detail above, Dr. Nielsen is entitled to STD and

24   LTD benefits.  Pursuant to 29 USC § 1132, Dr. Nielsen is entitled to recover these benefits

25   from Unum, CHI, and the LTD Plan.

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

153.     A regulation issued by the Washington Insurance Commissioner prohibits discretionary clauses in disability policies.  This regulation declares in pertinent part:

> (1) No disability insurance policy may contain a discretionary clause. "Discretionary clause" means a  provision that purports to reserve discretion to an insurer, its agents, officers, employees, or designees in interpreting the terms of a policy or deciding eligibility for benefits, or requires deference to such interpretations or decisions . . .

WAC 284.96.012.

154.     The LTD policy was issued to CHI in Colorado.  Under Colorado law,

> (2) An insurance policy, insurance contract, or plan that is issued in this state that offers health or disability benefits shall not contain a provision purporting to reserve discretion to the insurer, plan administrator, or claim administrator to interpret the terms of the policy, contract, or plan or to determine eligibility for benefits.

> (3) An insurance policy, insurance contract, or plan that is issued in this state shall provide that a person who claims health, life, or disability benefits, whose claim has been denied in whole or in part, and who has exhausted his or her administrative remedies shall be entitled to have his or her claim reviewed de novo in any court with jurisdiction and to a trial by jury.

Colorado Revised Statutes ("CRS") § 10-3-1116.

155.     State statutes or regulations like WAC 284.96.012 and CRS § 10-3-1116, which prohibit discretionary clauses, are not preempted by ERISA.  *Standard Insurance Co. v. Morrison*, 584 F.3d 837 (9th Cir. 2009).

156.     In particular, neither WAC 284.96.012 nor CRS § 10-3-1116 is preempted by ERISA.  *Landree v. Prudential Ins. Co. of America*, 833 F.Supp.2d 1266 (W.D.Wash., 2011); citing No. C10–484 RSL, *Murray v. Kane*, 2011 WL 617384 at *5 (W.D.Wash, Feb. 10, 2011); *McClenahan v. Metropolitan Life Ins. Co.*, 621 F.Supp.2d 1135 (D.Colo. 2009).  The provisions in the LTD policy purporting to grant Unum discretion to determine benefits constitute a violation of WAC 284.96.012 and CRS § 10-3-1116.  Accordingly, those provisions are invalid and have no effect.  Because the LTD policy contains no legally

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

effective clause conferring discretion on Unum, this court must apply a *de novo* standard of review concerning Unum's decisions.

157. Even if an abuse of discretion standard applies, Dr. Nielsen is entitled to benefits. Under the abuse of discretion standard, a plan administrator's decision will not be disturbed if reasonable. *Stephan v. Unum Life Ins. Co. of America*, 697 F.3d 917, 929 (9th Cir. 2012). This reasonableness standard requires deference to the administrator's benefits decision unless it is (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record. *Id*.

158. The degree of skepticism with which the court regards the insurer or administrator's decision when determining whether there was an abuse of discretion varies based upon the extent to which the decision appears to have been affected by a conflict of interest. *Id*.

159. Since Unum both determines disability benefits and pays for them, it has a direct financial incentive to deny claims. Unum's dual role as the entity that decides whether the claimant is entitled to benefits and if so the amount and duration, and its role as insurer, responsible for paying such benefits, creates a structural conflict of interest. *Id*. The weight to be accorded to a conflict of interest depends upon the likelihood that the conflict impacted Unum's decision making. *Id*.

160. Where circumstances suggest a higher likelihood that the conflict affected the benefits decision, the conflict should prove more important (perhaps of great importance). *Metropolitan Life Ins. Co. v. Glenn* , 554 U.S. 105, 117, 128 S.Ct. 2343 (2008); *Stephan*, 697 F.3d at 929.

161. The Supreme Court instructed in *Glenn* that a "conflict of interest ... should prove more important (perhaps of great importance) ... where an insurance company administrator has a history of biased claims administration." *Glenn*, 554 U.S. at 117. In so

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

stating, *Glenn* cited a law review article "detailing such a history for one large insurer." *Id.* (citing John H. Langbein, Trust Law as Regulatory Law: The Unum/Provident Scandal and Judicial Review of Benefit Denials Under ERISA, 101 Nw. U.L.Rev. 1315, 1317–21 (2007)). That insurer was Unum. *Id.*

162.    Numerous courts, including the 9th Circuit, have commented on Unum's history "'of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics,'" *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 137 (2d Cir.2008) (quoting *Radford Trust v. First Unum Life Ins. Co.*, 321 F.Supp.2d 226, 247 (D.Mass.2004), rev'd on other grounds, *934 491 F.3d 21, 25 (1st Cir.2007)). In *Saffon v. Wells Fargo & Co. LTD Plan*, 522 F.3d 863, 867, the court referred to "the cupidity of one particular insurer, Unum–Provident Corp., which boosted its profits by repeatedly denying benefits claims it knew to be valid. Unum–Provident's internal memos revealed that the company's senior officers relied on ERISA's deferential standard of review to avoid detection and liability." See also *Radford Trust*, 321 F.Supp.2d at 247 n. 20 (collecting cases).

163.    This Court must regard Unum's decision with a high degree of skepticism.

164.    As the facts recited in detail above demonstrate, Unum, CHI, and the LTD Plan abused whatever discretion they were entitled to exercise in denying Dr. Nielsen's claims.

165.    The Court should order Unum, CHI, and the LTD Plan to pay benefits to Dr. Nielsen under the LTD Plan, the LTD Policy, and the STD Program from May 21, 2010 through the time at which judgment is entered, plus pre-judgment and post-judgment interest, and plaintiff's actual attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1).

166.    For the reasons set forth in detail above, Dr. Nielsen is entitled under 29 USC § 1132 to an Order from this Court clarifying his rights under the LTD Plan, declaring that the provision in the LTD Plan and LTD Policy limiting benefits for a mental disability to one year

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

is void and unenforceable, declaring that Dr. Nielsen is entitled to all benefits to the same extent as a participant or beneficiary whose disability is caused by a physical injury or illness, and to equitable relief requiring Unum, CHI, and the LTD Plan to pay benefits to Dr. Nielsen the same extent as a participant or beneficiary whose disability is caused by a physical injury or illness.

167.    For the reasons set forth in detail above, Dr. Nielsen is entitled under 29 USC § 1132 to an Order from this Court clarifying his rights under the LTD Plan, and declaring that Dr. Nielsen will remain disabled, as that term is defined in the LTD Plan and the LTD Policy, for the rest of his life.  Dr. Nielsen is also entitled to equitable relief requiring Unum, CHI, and the LTD Plan to pay benefits to Dr. Nielsen from the time of entry of judgment until he reaches age 65.

168.    CHI is the designated Plan Administrator of the LTD Plan and the Program Administrator for the STD Plan.  It has failed to discharge its duties in violation of 29 U.S.C. §§ 1104, 1132, 1133, and 1140.  Dr. Nielsen is therefore entitled to relief authorized by 29 U.S.C. § 1132 against the Plan Administrator.

169.    At all relevant times, Unum and CHI were fiduciaries with respect to the exercise of authority over the management and administration of the LTD Plan and the STD Program, and the disposition of assets thereof.

170.    Unum and CHI breached their fiduciary duty by not acting solely in the interest of the Plan/Program participants and beneficiaries, by not acting in accordance with the Plan/Program documents, by failing to use all prudent care, skill, prudence and diligence of a prudent person in like circumstances, by failing to properly evaluate Dr. Nielsen's claim, and by placing their own financial interests ahead of those of Dr. Nielsen.

171.    In the alternative, in the event the Court determines based on the existing administrative record that Dr. Nielsen is not entitled to STD or LTD benefits to the full extent

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington  98105
206-438-3737 • Facsimile 206-632-2540

described above, the Court should reopen the administrative record in this case in order to consider additional evidence, including the determination by the U.S. Social Security Administration that under its rules Dr. Nielsen has been continuously disabled since May 28, 2010.

172.    On at least two occasions, June 19, 2013 and August 5, 2013, Dr. Nielsen (through his attorney) wrote to CHI asking for documents and information that CHI, as Plan Administrator, was obligated to provide to him.  CHI never responded to either of these written requests.  Pursuant to 29 USC § 1132(c)(1), CHI is liable to Dr. Nielsen in the amount of $100/day for its failure to provide the requested documents and information.

## JURY DEMAND PURSUANT TO FED.R.CIV.P. 38(b)

Plaintiff hereby requests that any and all aspects of this suit be tried before a jury pursuant to Fed.R.Civ.P. 38(b), subject to the further order of this Court.

## PRAYER FOR RELIEF

WHEREFORE, having stated his causes of action against defendants, Dr. Nielsen prays for the following relief:

1.    For benefits under the STD Program, including the full amount of his salary over the 90 day period that began 7 days after the date his disability began (May 21, 2010).

2.    For all benefits to which he is entitled under the LTD Plan and LTD policy. These benefits include the payment of monthly benefits of 60% of his gross monthly income just prior to the initial date of his disability, adjusted for inflation.  Dr. Nielsen is entitled to these monthly benefits from the end of the "elimination period" (as described in the LTD Plan and the LTD policy) to the date of entry of judgment in this action.

3.    For extra-contractual damages including  mental anguish, suffering, emotional distress, loss of peace of mind, and any other damages permitted by law.

AMENDED COMPLAINT - 48

1      4.      For treble damages under the CPA and IFCA.

2      5.      For judgment declaring the mental illness limitation in the LTD Plan and LTD

3  policy to be illegal, void, and unenforceable.

4      6.      For injunctive relief prohibiting any of the defendants from enforcing the

5  mental illness limitation in the LTD Plan and LTD policy.

6      7.      For injunctive and declaratory relief requiring Unum, CHI, and the LTD Plan

7  to pay benefits to Dr. Nielsen the same extent as a participant or beneficiary whose disability

8  is caused by a physical injury or illness.

9      8.      For judgment declaring that Dr. Nielsen will remain "disabled" under the terms

10  of the LTD Plan and LTD policy for the rest of his life and requiring Unum, CHI, and the

11  LTD Plan to pay LTD benefits to Dr. Nielsen from the time at which judgment is entered in

12  this case until he reaches age 65.

13

14      9.      For an order reopening the Administrative Record in this case to accept

15  additional proof of Dr. Nielsen's disability, including but not limited to the determination by

16  the U.S. Social Security Administration that under its rules Dr. Nielsen has been continuously

17  disabled since May 28, 2010.

18      10.     For an order authorizing Dr. Nielsen to obtain discovery in this cause related to

19  the extent to which Unum has a conflict of interest by being both administrator and payor of

20  claims, and the likelihood that the conflict impacted Unum's decision making.

21

22      11.     For prejudgment interest with respect to unpaid benefits through the time at

23  which judgment for benefits is entered in favor of Dr. Nielsen.

24      12.     For judgment that CHI is liable to Dr. Nielsen in the amount of $100/day for

25  its failure to provide requested documents and information under 29 USC § 1132(c)(1).

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540

1

2      13.    For attorneys' fees and costs (including expert witness fees) incurred in this

3 action pursuant to the CPA, the WLAD, Title III of the ADA, IFCA, common law, <u>Olympic</u>

4 <u>Steamship Company v. Centennial Insurance Company</u>, 117 Wash.2d 37, 811 P.2d 637

5 (1991), 29 U.S.C. § 1132, or any other applicable legal or equitable principles.

6      14.    For such other and further relief is the Court deems just and equitable.

7      Dated this 21st day of October, 2013.

8                            KEANE LAW OFFICES

9

10

11                        <u>/s/ T. Jeffrey Keane</u>
                       T. Jeffrey Keane, WSBA #8465

12                        Attorney for Plaintiff Ronald D. Nielsen
                       Keane Law Offices

13                        100 NE Northlake Way, Suite 200
                       Seattle, WA 98105

14                        Phone: 206/438-3737
                       Fax:   206/632-2540

15                        tjk@tjkeanelaw.com

16

17

18

19

20

21

22

23

24

25

KEANE LAW OFFICES
100 NE Northlake Way, Suite 200
Seattle, Washington 98105
206-438-3737 • Facsimile 206-632-2540